## BEATY v. RICHARDSON.

1. DOWER—CONSTRUCTION OF STATUTES.—If a husband desert his wife, and she afterwards live in adultery with another, she is not thereby debarred of her dower. Some rules as to construction of statutes stated. *Bell* v. *Nealy*, 1 Bail., 312, *distinguished from this.*

2. HOMESTEAD.—A question of homestead must be construed as the law stood at creation of the debt.

3. IBID.—ALIENATION.—Under the homestead laws previous to the Constitution of 1895, a devise of land was such an alienation as would defeat homestead to the heir at law. *Hendrix* v. *Seaborn*, 25 S. C., 481, *distinguished from this; and certain reasoning therein not approved.*

4. DOWER—INTESTATE ESTATES.—A widow taking dower is excluded from distributive share in husband's estate of which he dies intestate.

5. WILLS—REMAINDERS—WIFE—CHILD.—A devise to a woman with whom a man lives in adultery is void as to more than one-fourth of the clear value of his estate at instance of his lawful wife or child, but such devise is sufficient to support a remainder.

Before KLUGH, J., Spartanburg, October, 1898. Modified.

Action to set aside devise and for partition by Eugene Beaty, by guardian *ad litem,* against Violet Richardson, *alias* Violet Beaty, in her own right and as executrix of W. B. Beaty, Violet Beaty, the younger, and Charlotte Beaty. The Circuit decree is as follows:

Many years ago W. B. Beaty intermarried with the defendant, Charlotte Beaty. The issue of the marriage was one child, the plaintiff, Eugene Beaty. After living with his wife for several years in the town of Union, W. B. Beaty, familiarly known as Bird Beaty, left her and took up his residence in the city of Spartanburg, where he boarded with one Frank Fant and his wife, Violet. The parties are all negroes. In the process of time, Frank Fant became a resident of Atlanta, Georgia, leaving his wife in Spartanburg, and Bird Beaty continued to reside with her as a boarder. Some years prior to the commencement of this action Fant died, and thereafter Bird Beaty married the said Violet Fant, and they associated as husband and wife until his death. After leaving his wife, Charlotte, in Union, Bird Beaty made one or more visits to her, but eventually he declared that he never meant to live with her again, and seems to have absolutely deserted her. She followed him to Spartanburg and sought to win him back, but without success. Subsequently she married one Butler Black, and, he having abandoned her, she then lived for a time in illicit relation with one Woodson, who had a wife living at the time. Since the death of Bird Beaty, Charlotte was intermarried with one Reed. Bird Beaty died about March, 1896. He left a will, of which he nominated his so-called wife, Violet, executrix. His estate consisted of a house and lot in Spartanburg, worth about $1,500, and some personal property of little value. By his will he devised his realty to Violet, his wife, for life, with remainder to his son, Eugene, and his adopted daughter, Violet, in equal shares. All the rest of his property he bequeathed to his said wife, Violet, except his barber chair and tools, which he gave to Eugene.

This action is brought for the purpose of setting aside and

annulling the provisions of the will, in so far as they give to
the defendant, Violet the younger, an interest in the remain-
der, and in so far as they bestow upon Violet, the elder, a
greater portion than one-fourth of the real clear value of the
estate of the testator; and also for the purpose of having the
interests of the parties ascertained and set off to them respec-
tively.   The defendant, Violet Richardson, answers, deny-
ing the adulterous relations between herself and W. B.
Beaty, and alleging that she was his lawful wife, and fur-
ther alleging that said Beaty left debts greater than the value
of his personal property, and that it is necessary to sell the
realty to pay debts.   Violet Beaty is an infant, and submits
her rights to the protection of the Court.   Charlotte Beaty,
now Reed, claims her distributive share as the widow of Bird
Beaty, and sets up for herself and her son a claim of home-
stead and also claims dower.   The cause was referred to the
master, who finds that Bird Beaty was indebted to Violet
Richardson, but does not fix the amount of such indebted-
ness, and the record before me contains nothing by which the
same can be fixed.   The master further finds that Bird
Beaty and Violet Richardson lived together in adultery, and
holds that the provision for her in the will is void, except as
to one-fourth of the real clear value of the estate of the tes-
tator; that Charlotte is entitled to dower and also to home-
stead, and recommends that the estate be sold, etc.   Numer-
ous exceptions are filed by Violet and Violet, the younger,
and the plaintiff also excepts to the report. . It is not neces-
sary to consider these exceptions seriatim, and I shall rather
consider the rights of the several parties separately in rela-
tion to the estate of Bird Beaty.   And first as to Violet Rich-
ardson: The master rightly holds that she is entitled, under
the will of Bird Beaty, to nothing in excess of one-fourth of
the real clear value of the estate of said testator; and his find-
ings both of law and of fact upon that matter are approved
and confirmed.   Besides the residuary legacy of Violet
Richardson, the testator devises to her his entire real estate
for her life.   It is contended that this is worth more than

one-fourth of the real clear value of the estate, and there can be no doubt that this contention is correct. The rule laid down in the case of *Garland* v. *Crow,* 2 Bail., 24, for estimating the present value of a life estate, supports this position conclusively. By that rule the life estate is worth thirty-five per cent., or more than one-third of the free or entire estate. If we calculate the value of this particular life estate upon the basis of Violet Richardson's expectancy of life, which is thirty-one years, as fixed by the mortality tables, it will be found to be over $1,300 out of an estate whose entire value is only $1,500. The gift to Violet Richardson is, therefore, void as to so much thereof as exceeds the one-fourth part of the estate left after paying the testator's debts, and the life estate sought to be bestowed upon her falls to the ground. The will, in so far as it creates a life estate, being void, it follows that the remainder attempted to be created in favor of Eugene and Violet Beaty fails. There can be no remainder unless there be a precedent particular estate, "whose regular determination the remainder must await," 2 Minor Inst. (2d ed.), page 332. "If the particular estate be void in its creation, the remainder is always defeated," 1 *Ibid.,* 334.

These dispositions of Bird Beaty's will having failed, the property thus sought to be disposed of must be treated as intestate. In it Violet Beaty has no interest, and Violet Richardson has no other interest than as above indicated. What interest has Charlotte Reed? The master holds that she is entitled to both dower and homestead. In this he is in error. She forfeited her right to dower when she cast aside her marriage vows and voluntarily assumed a relation of adultery, which, so far as appears, continued until the death of her husband—Rev. Stats. (1893), sec. 1903, and case there cited of *Bell* v. *Nealy,* 1 Bail., 312. Under the statute, section 1904, having forfeited her dower, she also forfeited her distributory share. This leaves her without any interest in the estate of Bird Beaty, and with no right to claim homestead therein.

The indebtedness of W. B. Beaty must be ascertained and paid before there can be any distribution of his estate. The note in favor of Violet Richardson, above referred to, appears to be the indebtedness against the estate. There seems to be no question as to its validity. The report must be recommitted to the master to ascertain the amount due on the said note, and in this connection the account of the executrix ought to be stated and carefully scrutinized in order to ascertain what personalty, if any, is or should be in her hands applicable to such indebtedness. The personal property, except that specifically bequeathed, must be exhausted before recourse is had to the realty for the payment of his debts.

It is ordered, that the report of the master, in so far as it conflicts with the views above expressed, be overruled, and that in all other respects it be confirmed. It is further ordered, that the cause be recommitted to the master to ascertain, in accordance with the directions of this decree, the amount due upon the note of W. B. Beaty to Violet Richardson, and that he do report the same to this Court with all convenient speed, and that he have leave to report at the same time any special matter in relation to the said debt. It is further ordered, adjudged and decreed, that the real estate described in the complaint, to wit: a lot in the city of Spartanburg, * * * be sold by the master of Spartanburg County. * * * That out of the proceeds of said sale the master first pay to the party entitled thereto the costs and disbursements of this action, to be taxed by the clerk of the court; that he next pay to Violet Richardson the amount ascertained to be due her on the aforesaid note; and that the rest of said proceeds of sale he pay one-fourth to Violet Richardson and the remaining three-fourths to Eugene Beaty (it appearing that he is now twenty-one years of age) or to their respective attorneys, and that he make a report of said sale to this Court.

From this decree all parties appeal, except the defendant, Charlotte Beaty.

*Messrs. R. K. Carson* and *Simpson & Bobo,* for Violet Richardson and Violet Beaty, cite: *Charlotte Reed has no interest in the estate in question:* Rev. Stat., 1903; 1 Bail., 312. *The remainder is not defeated:* 43 S. C., 44. *Son not entitled to homestead as against devise:* Rev. Stat., 2129; 26 S. C., 97; 54 S. C., 208; 25 S. C., 572; 5 Am. St. R., 41; 113 N. C., 421; 19 S. C., 238.

*Messrs. Munro & McCravy* and *Munro & Munro,* for Eugene and Charlotte Beaty, cite: *The widow, Charlotte, is entitled to dower:* 1 Bail., 312; 62 Pa. St., 308; 82 Id., 537; 3 N. H., 41; 12 Lea, Tenn., 292; 35 N. C., 361; 2 Brock. U. S., 256. *Plaintiff and his mother are entitled to homestead:* 25 S. C., 481; 49 S. C., 41. *Plaintiff's mother is entitled to homestead:* 40 L. R. A., 750. *Devise to mistress is void except as to the one-fourth part of the clear value of the estate:* Dud. Eq., 124; 2 Bail., 24.

October 11, 1899.   The opinion of the Court was delivered by

MR. CHIEF JUSTICE McIVER.   This is an appeal from the decree of his Honor, Judge Klugh, a copy of which should be incorporated by the Reporter in his report of this case, based upon exceptions which raise the following questions: 1st. Whether the defendant, Charlotte Beaty, is entitled to dower in the real estate of which her husband, W. B. Beaty, died seized and possessed.   2d. Whether she is entitled to a homestead in her said husband's estate.   3d. Whether she is entitled to a distributive share in such part of her deceased husband's estate as to which he may have died intestate.   4th. Whether the plaintiff, either jointly with his mother or alone, is entitled to homestead.   5th. Whether the devise of a life estate to Violet, the elder, in all the real estate of which the testator died seized and possessed, is void in whole or in part only, and whether that defeats the remainder in such estate to the plaintiff and to the defendant, Violet, the younger.

The facts out of which these questions arise are so fully and clearly stated in the Circuit decree as to supersede the necessity of any formal restatement of them here; and as there is no exception to any of his findings of fact, they must be adopted as correct. We propose, therefore, to proceed to consider these questions in their order, and first as to the claim of dower. Charlotte Beaty having been the lawful wife of the testator, she would, unquestionably, upon his death, be entitled to dower in all the real estate of which he was seized during the coverture; and the only question is whether she has forfeited such right. "At common law, elopement and adultery of the wife did not operate as a bar of dower." 2 Scrib. on Dower, 531, citing 2 Coke Inst., 435. Consequently, if Charlotte Beaty has forfeited her right of dower, it must be by virtue of some statute; and the only statute in this State upon the subject is that of 13 Edw., 1 Ch., 34, commonly called the Statute of Westminster 2, which was declared of force in this State by the act of 1712, 2 Stat., 422, and reads as follows: "If a wife willingly leave her husband, and go away and continue with her advoutrer, she shall be barred forever of action to demand her dower, that she ought to have of her husband's lands, if she be convict thereupon, except that her husband willingly, and without coercion of the Church, reconcile her, and suffer her to dwell with him; in which case she shall be restored to her action." That statute was re-enacted in the Gen. Stat. of 1882, as sec. 1799, in precisely the same language, except that the words, "and without coercion of the Church," are omitted, being inapplicable here, and is now incorporated in the Rev. Stat. of 1893, as section 1903. The inquiry is, therefore, narrowed down to the question, whether, under the established facts of this case, Charlotte Beaty has forfeited her right of dower by virtue of the provisions of the statute above quoted. It will be observed that the statute plainly declares that if a wife *willingly* leaves her husband *and go* away and continue with her advoutrer, she shall be barred of her dower. If, there-

fore, the statute be interpreted according to its language, which contains no ambiguity, it is obvious that two things must combine to constitute the bar—1st, the wife must willingly leave her husband; 2d, she must continue with her advoutrer, a word now obsolete, but signifying the same thing as our word adulterer—Webster's International Dictionary. The mere fact that the wife has voluntarily left her husband does not, alone, constitute, nor does the mere fact that the wife has left her husband and is living in adultery, alone, operate as a bar to her action of dower. As is said in that very valuable work, Am. & Eng. Ency. of Law, vol. 10 of 2d edition, at page 200: "By the Statute of West. 2 (13 ed., 1 Ch., 34), it was provided that adultery committed by the wife, accompanied by a voluntary elopement, unless there was afterwards a reconciliation with her husband, should bar her dower." That this is a proper construction of the statute cannot admit of a doubt, under the well settled rules laid down for the construction of a statute. In Potter's Dwarriss on Stat., the rule is thus laid down: "That where the language is explicit, the Courts are bound to seek for the intention in the words of the act itself, and they are not at liberty to suppose or to hold that the legislature intended anything different from what their language imports." So in the comparatively recent work of Endlich on the Interpretation of Statutes, sec. 4, it is said: "The legislature must be intended to mean what it has plainly expressed, and consequently there is no room for construction * * * where the words of a statute are plainly expressive of an intent, not rendered dubious by the context, the interpretation must conform to and carry out that intent. It matters not, in such a case, what the consequences may be. It has, therefore, been distinctly stated (quoting from Wilberforce on Stat. Law) from early times down to the present day, that judges are not to mould the language of statutes in order to meet an alleged convenience or an alleged equity; are not to be influenced by any notions of hardship, or of what in their view is right and reasonable or is prejudicial to

society; are not to alter clear words, though the legislature may not have contemplated the consequences of using them; are not to tamper with words for the purpose of giving them a construction which is supposed to be more consonant with justice than their ordinary meaning." So, also, that author, in sec. 5, declares that considerations of public policy are not to be regarded, quoting these words of Mr. Justice Story: "Arguments drawn from impolicy or inconvenience ought here to be of no weight. The only sound principle is to declare *ita lex scripta est,* to - follow and to obey." Another well settled rule of interpretation is that every word found in a statute shall be given, if practicable, due force and effect. Endlich, sec. 23. There is also another rule which seems to be applicable to this case: "Statutes by the authority of which a citizen may be deprived of his estate must have the strictest construction." Potter's Dwarris on Stat., 146; or, as it is expressed in a note on page 257 of the same work: "Every statute derogatory of the rights of property, or that takes away the rights of a citizen, is to be strictly construed. So, also, a statute in derogation of the common law." . See, also, Endlich, secs. 341 and 343. In view of these well settled rules it is clear that, under the undisputed facts, the appellant's, Charlotte Beaty's, claim of dower is not barred by the provisions of the statute above referred to; and could not be, without placing a forced construction upon the plain language of that statute, in direct violation of every one of the rules above stated; for the undisputed fact is that she did not willingly leave her husband —indeed, did not leave him at all; on the contrary, he deserted her, and resisted all her attempts to win him back; and it was only after her unsuccessful efforts to that end that she was found living in adultery, first with Black and next with Woodson—for, although she went through the form of marriage with Black, yet, as her lawful husband was then alive, that connection must be regarded as adulterous. To hold that, in this case, the claim of dower is barred by the provisions of the statute, would necessitate one of two things,

both of which are forbidden by the well settled rules of interpretation, either to utterly ignore the word "willingly," which is found in the statute, or to substitute the word "or" for the word "and." Now, while there are cases in which words may be eliminated from a statute or rejected as surplusage, as may be seen by reference to Endlich, secs. 301, 302, yet this is not authorized where the words used are plain and no ambiguity arises as to what was the intent of the legislature. Here there is no ambiguity or inconsistency in the language of the statute, and no reason whatever why every word in it cannot be given its due force and effect. So, also, there are cases in which the word "and" may be substituted for the word "or," as pointed out in sec. 303 of the same work, but as is laid down in sec. 305, this can never be done where the meaning of the language used in the statute is plain, and there is nothing in it to call for such substitution. Here there is nothing which calls for or warrants any such substitution. It is difficult to conceive how the legislature could have expressed its intention in plainer language. They must be presumed to have known, both when this statute was originally made of force in this State, and when it was re-enacted in 1882, that neither elopement nor adultery, nor both combined, operated as a bar to the claim of dower at the common law; and when they determined to change the law in this respect, if the intention had been to declare that adultery or a living in adultery should bar this claim of dower, it would have been very easy to have said so; but they did not say so. On the contrary, they declared in plain unmistakable language what would operate as a bar to the wife's claim of dower, viz: if she *willingly* left her husband *and* continued with her adulterer. This view is fully supported by the case of *Elder* v. *Reed*, 62 Pa., 308, and also reported in 1 Am. Rep., 414, in which the facts were much stronger against the wife's claim of dower than in the case under consideration, and yet the claim of dower was sustained. In that case, Mr. Justice Sharswood, in delivering the opinion of the Court, after setting out the terms of

the statute, uses this language: "As well by the express
words of this statute as the uniform construction put upon it
by the Courts, elopement or, perhaps, to speak more accur-
ately, a voluntary separation or departure, by the wife from
her husband, as well as adultery, is necessary to make the
bar complete. * * * It is true, that this elopement need not
be with the adulterer; for even where there has been a volun-
tary separation by mutual agreement, the statute applies.
* * * It is still necessary, however, that she should have
separated herself from him *sponte*—willingly." And after
citing the authorities, he proceeds as follows: "Now there was
not only no evidence that the plaintiff had willingly left her
husband, but the proof was direct, positive and uncontra-
dicted, that he had deserted her. * * * His own crime of
unfaithfulness to his marriage vows exposed her to seduc-
tion, and that she fell was as much his fault as hers." The
fact which appeared in that case, that after both husband
and wife had been living in adultery for some time, they
became reconciled and lived together until the death of the
husband, does not seem to have had any influence upon the
decision, for after construing the statute as above stated, the
learned Justice used this language: "This view renders it
unnecessary to consider the effect of the evidence of final
reconciliation between John Elder and the plaintiff, as it
only could become important if the dower had been barred
by the force of the statute." The case of *Bell* v. *Nealy*, 1
Bail., 312, upon which the Circuit Judge relies to support his
conclusion, does not sustain him. In that case it is stated in
the report that: "It appeared in evidence that the wife was
compelled by the ill treatment of her husband to fly from his
house; but that he afterwards, and frequently, solicited her
to return and live with him; which she refused to do, saying
that she never had liked him. A year or two afterwards he
married a second wife, and she then married one Graham,
with whom she lived and cohabited during the life of her
first husband." Upon this evidence the Circuit Judge in-
structed the jury that in his opinion the wife was barred of

her dower, saying: "The refusal to return, when no good reason exists for it, goes far to show that the original separation was not altogether involuntary, and did not originate entirely in necessity.   It was clear upon authority, however, that although the elopement of the wife was not voluntary, but her departure had even been compulsory, yet if she *voluntary remain* with her adulterer, when the husband is *willing to take her back* (last italics ours), she is barred by the statute."   This shows that the true and real ground of the Circuit Judge's opinion, which was simply adopted by the Court of Appeals, was the refusal of the wife to return to her husband on his offer to take her back, and afterwards *voluntarily* remaining with her adulterer, and not merely that she was living in adultery.   This was manifestly the view taken by Mr. Bailey, the Reporter, who is well known to have been a very learned and able lawyer, for he thus states, in his head notes, the point decided in the case: "If the wife leaves her husband by compulsion, but refuse to return on his offer to take her back, and afterwards live in adultery, she is barred of her dower."   It is apparent, therefore, that the case relied on only decides that a refusal of the wife to accept her husband's offer to take her back and afterwards living in adultery will bar her claim of dower; and it is very certain that the case affords no indication whatever as to what the Court would have decided if there had been no offer of the husband to take his wife back, or no refusal to accept such offer.   Now in this case there was not a tittle of testimony tending to show that the husband ever offered to take his wife back, and, of course, no refusal of any such offer.   On the contrary, the uncontradicted evidence in this case is that the husband deserted his wife and rejected all of her appeals to return to her, declaring that he never intended to live with her again.   We do not think, therefore, that the case of *Bell* v. *Nealy, supra,* sustains the conclusion reached by the Circuit Judge, and on the contrary that case seems rather to sustain our view; for it manifestly implies that the refusal of the wife to accept her husband's offer to take her back, espe-

cially when accompanied with her declaration "that she never had liked him," practically amounted to the same thing as if she had willingly left him. We are of opinion, therefore, that so much of the decree of the Circuit Judge as holds that the claim of dower on the part of the appellant, Charlotte Beaty, cannot be allowed, must be reversed. If we were sitting as a "Court of conscience," and not as a Court of law, our view might, and probably would be, very different. But administering the law as we find it written, and construing it according to rules which have been long well settled, by which the legal rights of parties litigant must be determined, we are not at liberty to allow ourselves to be influenced or controlled by considerations of mere sentiment, which, however well founded in the purest morality, are not declared or enforced by the law of the land; nor are we permitted to strain the law, as we find it written, in order to promote what we conceive to be good policy. In fine, we have no authority either to make or amend the law. That power has been wisely entrusted to another department of the government, upon whose domain we have neither the right nor the disposition to encroach.

The second question above stated will next be considered, which involves the proper construction of the homestead laws of this State. It must first be observed that the right of homestead did not exist at common law, but owes its origin solely to the Constitution and statute law. But as there have been material changes in the homestead law, our first inquiry is what law is to be applied to this case. Inasmuch as the rights of creditors are here involved, we cannot determine this question by the law as it stood at the time of the death of the testator, when the right of homested, if any, accrued, as was done, and properly done, in *Bostick* v. *Chovin,* 55 S. C., 427, where the rights of creditors were *not* involved; for in that case it was plainly implied that if the rights of creditors had been involved, it would have been different. This is important, because the law as it stood, prior to the adoption of the pres-

ent Constitution, was materially different from the law as it is now declared by the act of 1896—22 Stat., 190—pursuant to the present Constitution, upon the very point upon which the present controversy turns; for by sec. 2130 of Rev. Stat. of 1893, it was declared "that no right of homestead shall exist or be allowed in any property, real or personal, aliened or mortgaged," &c., whereas by the present law it is declared that the right of homestead, before assignment, shall not be waived or defeated, "except it be *by deed of conveyance or mortgage*" (italics ours). Now while it does not distinctly appear in the "Case" as printed, at what time the only debt of which we hear was contracted, yet as it does there appear that the testator died in February, 1896, very soon after the present Constitution went into effect, and as it was admitted at the hearing that this debt amounted to $400 with interest from 1893, we must conclude that such debt was contracted prior to the adoption of the present Constitution, and that the question must be determined by the law as it stood before the present Constitution was adopted.

As we have seen, it was expressly declared that no right of homestead should be allowed in any property "aliened or mortgaged, either before or after assignment," and, therefore, the practical inquiry is as to the effect of the devise contained in the will of the testator; does it amount to such an alienation as would defeat the right of homestead? We are unable to see any valid reason why it should not. It is well settled, in this State at least, that the homestead laws effect no change in the title to property. As was said in *Elliott* v. *Macorell,* 19 S. C., at page 242, the purpose of such laws "was not to create any new estate, or to invest estates already existing with any new qualities, or to subject them to any restrictions, but to secure a right of exemption by forbidding the use of the process of the Court to sell certain property for the payment of debts," and as was said in *Ex parte Ray,* 20 S. C., at page 248, "We do not understand the homestead laws as designed to alter or in any way affect the statute for the distribution of intestate's

estates, and they do not even purport so to do." Now if the
homestead laws create no new estates, and do not invest
those already existing with any new qualities, or "subject
them to any restrictions," and do not "in any way affect the
statute for the distribution of intestate's estate," why should
they be held to affect in any way the Statute of Wills, by
which it is declared (sec. 1987 of Rev. Stat. of 1893) that
any person, having right or title to any property, "may dis-
pose thereof by will, in writing, at his or her own free will
and pleasure, except as herein provided;" and there is no
provision therein forbidding any interference with the right
of homestead. The case of *Hendrix* v. *Seaborn*, 25 S. C.,
481, is relied upon to sustain a conclusion contrary to that
which we have adopted. While it is true that remarks are
made *in the reasoning* of the distinguished Justice who pre-
pared the opinion in that case, which would seem to be in
conflict with the conclusion which we have reached, we do
not think that the *point decided* (which is all that is authori-
tative in any case) is inconsistent with our conclusion in this
case. As we learn from the opinion in that case, there being
no copy of the will set out in the case, the testator "provided
as follows, viz: that all his property should be sold, and the
proceeds applied, *first,* to the payment of his debts; *second,*
a bequest of $200 to Lula Owens, a young girl whom he had
raised; and *third,* the residue, if any, to go to his widow,
Matilda Hendrix." The widow set up a claim of home-
stead, and the question was, as stated by Mr. Justice Mc-
Gowan, in delivering the opinion of the Court, "whether
that testamentary disposition was such an 'alienation' of
his property, in the sense of the act, as to exclude the widows'
right to the exemption after his death." It will be observed
that he says, the question was "whether *that* testamentary
disposition (the terms of which he had previously stated),
*not* whether *any* testamentary disposition by a testator of
the whole of his property, would exclude the widow's right
of homestead. Again he says: "The legacy to Lula Owens
being a voluntary gift, cannot stand in the way of creditors,

and, therefore, the only question in the case is, whether the widow is entitled to the exemption of $500 (the testator's estate consisting exclusively of personalty) as against the debts of the testator, to which he directed it to be paid by his will." It seems to us that the true view of that case is that the provision in the will directing "that all his property should be sold and the proceeds applied, first, to the payment of his debts," was not a testamentary disposition of his property in such a sense as would amount to an alienation of it; for it was not given to any one whomsoever. It was simply a provision which the law would require, even if no such words were contained in the will; and the rule is that where a testator undertakes by his will to dispose of his property in the same way the law would dispose of it, if there were no will, such testamentary disposition, as said by Dargan, Ch., in his Circuit decree, in *Seabrook* v. *Seabrook,* 10 Rich. Eq., at page 503, "is nugatory and void," which was affirmed by the Court of Appeals. There was, therefore, no testamentary disposition of property in that case, and, of course, no alienation of it, for to constitute an alienation there must be an alienee, and there was none in that case. If, however, the language of the will last quoted should be regarded as an attempt by the testator to exclude the widow's right of homestead secured to her by the law of the land, it could not be allowed to have that effect, under the principle decided in *Gordon* v. *Blackman,* 1 Rich. Eq., 61, adopted and followed in the subsequent case of *Crosby* v. *Smith,* 3 Rich. Eq., 244, where it was held that while a person may dispose of his property by will as he pleases, he cannot exclude those whom the law appoints to the succession by a mere declaration that they shall not take, but can only do so by making some other valid disposition of his property. While, therefore, we have no fault to find with the point really decided in the case of Hendrix *v.* Seaborn, we cannot approve all of the reasoning employed in that case. Under the view which we have adopted, that the claim of homestead set up by the appellant, Charlotte Beaty, cannot be allowed, it becomes unnecessary

to consider what would be the effect of her conduct, or of the fact that she was not living on the homestead as a part of the family of the testator at the time of his death, but, so far as she could do so, had become a part of the family, in fact if not in law, of another man with whom she was living in adultery. The exceptions raising the second question above stated must, therefore, be overruled.

Proceeding next to the third question. Having held that the appellant, Charlotte, is entitled to dower, she is thereby excluded from any claim to a distributive share of such portions of her husband's estate as to which he may have died intestate, as was held in *Glover* v. *Glover,* 45 S. C., 51, and the cases there cited.

The fourth question is concluded by what we have said in considering the second question. The exceptions raising this question must, therefore, be overruled.

It only remains to consider the fifth question, which has been stated above. By the terms of his will the testator devised, in the first clause, his "dwelling house and lot on Church street, in the city of Spartanburg (which seems to be the only real estate owned by the testator), to my wife, Violet Beaty, during her life, and from and after her decease to my son, Eugene Beaty, and my adopted daughter, Violet Beaty, and their heirs and assigns forever, in equal shares as tenants in common." In the second clause he bequeathes his "Barber chairs, razors and all tools appertaining to my trade, to my son, Eugene Beaty," who is the plaintiff herein. All the residue of his property, after payment of his debts and funeral expenses, he bequeathes "to my wife, Violet Beaty," and he appoints her executrix of his will. It is conceded that the person spoken of in the will as Violet Beaty and designated as the wife of the testator, was not his wife, but was a woman with whom he was living in adultery, and whom we shall designate as Violet, the elder. There can be no doubt that, under the provisions of the act of 1795, now incorporated in the Rev. Stat. of 1893, as sec. 1999, so much of the devise and be-

quest to Violet, the elder, as exceeds in value the one-fourth part "of the real clear value" of the testator's whole estate, both real and personal, after the payment of his debts, must be declared void at the instance of either the lawful wife or any legitimate child of the testator; and in this case the plaintiff, who is conceded to be the only legitimate child of the testator, makes this demand, and Charlotte Beaty, his lawful wife, joins in such demand. The cases upon which we rely as establishing the proper construction of that statute are *Breithaupt* v. *Bauskett*, 1 Rich. Eq., 465, which, though a Circuit decree of that eminent jurist, Chancellor Harper, not appealed from, has been distinctly recognized and followed in the subsequent cases of *Hull* v. *Hull*, 2 Strob. Eq., 174, and *Taylor* v. *McRa*, 3 Rich. Eq., 96. From the express terms of the statute and from the construction of such terms, in the cases just cited, it is apparent that the devise and bequest to Violet, the elder, are not void *in toto,* but only for so much thereof as exceeds in value the one-fourth part of the clear value of the testator's whole estate, after the payment of his debts. This being so, it is a mistake to say, as is said in the Circuit decree, that the will, in so far as it creates a life estate, is void, or to say that the particular estate (the life estate given to Violet, the elder,) being "void in its creation," the remainder must be defeated. For, as was held in *Breithaupt* v. *Bauskett, supra,* a devise to a mistress or to an illegitimate child, is not void, but only voidable at the instance of the lawful wife or a legitimate child. But here the particular estate is not even wholly voidable, but is good and valid to the extent of one-fourth of the clear value of the testator's estate. Hence, even after the devise to Violet, the elder, is declared void at the instance of the testator's lawful wife and legitimate child, to the extent which its value exceeds one-fourth of the clear value of the testator's estate, there still remains a particular estate, which, though reduced in value, is sufficient to support the remainder. But even if the devise could be regarded as wholly void in its creation, the case of *Key* v. *Weathersbee,*

43 S. C., 414, goes very far to show that the remainder would not, thereby, be necessarily defeated. But we need not now decide that point, for, as we have seen, this devise cannot be regarded as void in its creation; for if so, no subsequent circumstances could render it valid, and as all the cases above cited conclusively show that such a devise is absolutely good and valid against all the world, even the next of kin of the testator, except the lawful wife and legitimate children; and if not declared void, to the extent above indicated, as to them during their lifetime, remains good. So much, therefore, of the Circuit decree as adjudges that the remainder to the plaintiff, Eugene Beaty, and to the defendant, Violet, the younger, is defeated, must be reversed.

The facts set out in the "Case" are not sufficient to enable this Court, now, to render such a judgment as would finally dispose of this case, and, therefore, the case must be remanded to the Circuit Court, in order that the following facts may be ascertained: 1st. What is the clear value of the entire estate of the testator, after the payment of his debts, the precise amount of which does not now appear? and in ascertaining the value of the testator's estate, the value of the dower herein allowed to his widow, the appellant, Charlotte, must first be deducted from the value of the real estate. For it is well settled that the widow's dower constitutes no part of her deceased husband's estate, and cannot be disposed of by him either by will or otherwise, unless she chooses to accept a provision in her husband's will made in lieu of her dower. As is said by Dargan, Ch., in his Circuit decree in *Cunningham* v. *Shannon,* 4 Rich. Eq., at page 140, which, upon this point, was affirmed by the Court of Appeals: "Dower is a right, which, inchoate during the coverture, becomes absolutely vested in the wife as an estate, on the death of her husband; and is as much beyond his control or power of disposition as her own inheritance. It not being *his* to give, every devise which he makes of the land upon which the right of dower attaches is presumed to be given subject to the legal estate, unless the contrary appears on the face of

the will, in express words, or by the strongest kind of impli-
cation." And as nothing of the kind appears in this will, it
follows necessarily that the value of the widow's dower
herein allowed cannot be included in any estimate of the
value of the testator's estate. And as it is manifest that the
nature and character of the testator's real estate is such that
the widow's dower cannot be set apart in kind without injus-
tice to all parties concerned, and a sale is, therefore, neces-
sary, one-sixth of the proceeds of such sale should first be set
apart as the widow's dower, and not counted as any part of
the testator's estate. 2d. What is the value of the life estate
devised to the defendant, Violet, the elder. For although
the Circuit Judge does find that the value of such life estate,
whether measured by the rule laid down in the case of *Gar-
land* v. *Crow*, 2 Bail., 24, or upon her expectancy of life as
fixed by the tables of mortality, would exceed one-fourth of
the clear value of the testator's estate, he does not find which
of these two modes of measurement should be adopted, and
as they differ in the result, the time value must be judicially
ascertained, which this Court is not at liberty to do, as there
is no exception raising the question. 3d. What amount is
necessary for the payment of the debts of the testator. 4th.
What amount is or should be in the hands of the executrix
applicable to the payment of debts and funeral expenses.
Thereupon the Circuit Court should render a decree: 1st.
That the real estate be sold at such time and upon such
terms as to that Court may seem best for the interests of all
parties concerned. 2d. That one-sixth of the net proceeds
of such sale, after paying the costs and expenses properly
incident thereto, be paid to the appellant, Charlotte Beaty, or
her attorneys, in satisfaction of her dower. 3d. That, after
exhausting the personalty applicable to the payment of
debts, such proceeds of sale be applied to the payment of any
debts that may remain unpaid. 4th. That so much of the
balance of such proceeds as shall not exceed one-fourth of
the clear value of the testator's entire estate, as ascertained
in the manner hereinbefore directed, be paid to Violet, the

elder, after the corpus of the same has been properly secured to the remaindermen, Eugene Beaty and Violet, the younger, who will be entitled to receive the same upon the death of Violet, the elder. 5th. That any balance that may remain of such proceeds be paid to Eugene Beaty and Violet, the younger, or to their respective attorneys, in equal proportions. 6th. That such provision be made for the payment of the costs and disbursements of this case, as may seem to the Circuit Court most equitable and just.

The judgment of this Court is, that the judgment of the Circuit Court be reversed in the several particulars hereinabove indicated, and, in all the points which do not conflict herewith, that it be affirmed, and that the case be remanded to the Circuit Court for the purpose of carrying out the views herein announced.